Membership. But despite NISBAN's explicit teaching, the District Court brushed off a host of reasons why plaintiff's records cannot reliably determine membership. I could just interrupt for a second. My clock has not begun, so I just wanted to flag that. Thank you. I wouldn't do that. You could go on forever. That's my job. I'll spare you that, Your Honor. So the basic issue, of course, under NISBAN and ascertainability is, can you identify the class members in an objective, reliable way without much, if any, individualized inquiry? I thought what happened here is that they determined the membership in two phases. One, they identified who purchased the drugs using the benefit managers transaction data, then confirming that class membership with first and third party proof of end-payer status. What else could you do? I mean, I think, Your Honor, you have to look at the different buckets of data that they point to, and I'd like to take them one by one. Go ahead. There's PBM data, there's what they call receipts, and then there's affidavits. So starting with the PBM data, the standard of review here can't save the fundamental defects in their data. It has the same problem as existed in NISBAN, which is that there's an issue of what capacity these entities are making payment in. Are they making a payment in a capacity where there's no one left to reimburse them, and they're therefore on the financial hook, or are they making payment in a capacity where they're an intermediary and will pass it on? And that's the fundamental defect in the data here, and in fact, Kraft admits this defect in the PBM data, and so they say, well, we'll supplement that. They say this record is different than NISBAN. The second thing they point to are so-called receipts, and before I talk about the details of those receipts, I just want to note they are trying to evoke in your mind the image of, you know, you're going to Best Buy and you buy a new phone charger, and it says receipt, this is what you pay. This is not like that. These are voluminous documents with, you know, data that goes across a host of axes, and you have to drill down and figure out what does this say, and let's look at their blue-ribbon marquee examples. Kraft cites the Sargent's Benevolence Association, but she admits, and she uses the phrase, interesting, nothing on the face of this document shows the capacity in which this payment payment is being made. From their best example of tens of thousands, they give you six, and she admits that's at pages 34, 26, to 27 of the record, so this is not a one-off problem. It's true of all the data, and this court's precedents require some way of doing a simple yes-no checkoff from the face of the document. That's the language of Kelly. She says it's not there on the face of the document, so that then leads to affidavits. Affidavits serve a corroborating feature. This court has said that over and over. Of course, they're not self-authenticating under the federal rules. You have to be able to test them. Defendants have a due process right to test them. There are three problems with the affidavits here. Number one, they're hypothetical. We have yet to see one, and I would suggest that that is a very strategic choice on their part, because if they did submit an affidavit, it would have to go into some excruciating detail about how they know that the payment was made, which would simply highlight all the individualized issues here. Second, the plaintiffs generally lack the information that they need to swear to what they need to swear to in these affidavits. Again, Kraft admits that the PBM data don't contain what they need to contain, and all of these folks keep records in different ways. They all have different reasons to keep record, different incentives, so they really generally don't need what they need to have to actually say we can swear we paid for this and in this capacity. And then finally, even if they had the right data, and this applies essentially across the board to all of the different types of hypothetical records they're pointing to, you need to be able to corroborate it by a straightforward yes-or-no review from the face of the document. Kelly talks about that, other cases of this court talk about that, and here there's no database or repository, let alone a standardized way of keeping these records that would allow that. We're talking literally here about millions of transactions, tens of thousands of plaintiffs, and it's a serious ascertainability problem. This court's precedents have never gone so far as to uphold something like that, and this case should not be the first. If there are no further questions on ascertainability, I will turn to the issue of predominance. As discussed in the earlier case, the central lesson of Lamictal is that an expert methodology needs to be carefully tailored to the complexities of the particular industry's supply chain. And in a market with individualized negotiations, as all agree is the case here, courts can't allow averages to mask individual price differences. This court reversed in Lamictal due to a lack of multi-leveled economic analysis of what each defendant would have done in a but-for world. This is very much an a fortiori case. That was a one-step direct purchaser supply chain. Here there are at least four steps, sometimes five to seven, and there are two fundamental problems with both experts' model on the plaintiff's side. First, they don't trace overcharges down through the chain. They skip levels, they don't calculate overcharges for levels four to seven. Second, they do not account for individualized negotiations. They use correlations, aggregated, and averaged numbers. Now exhibit A. Did we hold that averaging can't mask differences in prices or did we hold that it can't mask whether every class member was injured? I think you said essentially both. You said that the there needs to be capable of class-wide proof that's capable of approving proving that every member of the class had an injury, and then you said that the in a market with individualized negotiations that you can't have averaging that masks individual differences in price. I thought what I focused on was injury. You thought we focus on interim, so I just didn't hear you, your honor. I thought what I focused on was injury. Yes, we agree, your honor, and exhibit A, there are 24% of the commerce at issue here involve myelin sales to CVS where there can't be any injury. The district court has now dismissed those transactions from the case, but they reveal a more fundamental defect in the averaging methodology. The plaintiffs admit there's no injury on those particular transactions. It's page 3379. The problem is is the methodology that produced it is fundamentally defective. Lam admits that he didn't do any kind of individualized inquiry. That's at pages 3448 to 49. McClave likewise relied on averages. We we go into quite a bit of detail. Does it matter when they conclude that virtually all of the purchase were purchases were impacted by the antitrust violations? Right, I get them to be saying I understand your argument about masking, but I think your friend on the other side will say well there's no there's no masking here because everybody, virtually everybody, approaching a hundred percent, paid more than they would have without the without the conspiracy. So doesn't that distinguish Lam? So I would say a couple things about that, your honor. First of all, you know, it's not enough just to show that there were increases in prices. You have to show causation. When they when they point to these, you know, astronomical increases in price that they say, you know, show that there must have been an antitrust violation, they're talking about list prices, which it's undisputed no one pays. And again, exhibit A is the CVS transactions. That's 24% in and of itself, and it shows, you know, they experienced no increase whatsoever, but there are others. You know, Cardinal had only a nominal increase, and more generally it's undisputed that these prices are individually negotiated. So that brings it back to the problem with the methodology, which is that the averaging masks the variation. So finally, on Comcast, there's just a fundamental disconnect here between the plaintiff's damages model and their liability case. Their model covers a hundred percent of the purchases at issue, and we know that 24% are gone. It's just a huge disconnect. It's, you know, probably the most glaring predominance problem, and it independently warrants reversal. In which matter? In the EPP matter. There's also a Comcast issue in the DPP matter. Obviously we've discussed that, but the... After the class certification, there was a partial summary judgment given to Ireland in connection with the sales to CVS. That's correct. How does that affect us here? Well, that's what creates the huge mismatch between the damages models, which claims damages for all hundred percent of the transactions, and the liability case, a quarter of which is now gone. But it also reveals an underlying... The 373 are gone? Well, Your Honor, we think there's more. I mean, we've identified those. It's their burden to show, of course, that they have a reliable method that doesn't claim injury for folks who aren't injured. But nobody... Well, I mean, I got a chicken-and-egg problem. How do I take into account something that happened months after the class certification decision, which is on appeal here? So two things about that, Your Honor. We've made this argument all along as to this 24%, and with the record evidence that's cited in this brief, the district court's decision granting summary judgment as to those 24%, and the court said the evidence is too sparse to permit an inference that CVS paid an inflated price per commemorating. So summary judgment is granted in part as to Milan's sales to CVS. That's now confirmed what we've been saying all along, but the evidence has been there all along. And that would call for what, in your view? A remand? That calls for a reversal under Comcast. Well, doesn't Comcast apply when the inconsistency between the theory of liability and damages model, does Comcast apply there when it happens after class certification? Well, again, this problem has been there all along, Your Honor. It's just that the summary judgment ruling confirms it, but they have offered no way to cure this, and that's for good reason, because they're using averages. They can't just pull these transactions out because they're using average data to get their injury and damages arguments. Wait, why can't they be put, I mean, they have not identifiable? They have not, they have not identified. Why can't they be pulled? Why can't you pull out the 24% of those transactions? Well, of course, there can't be liability for them, Your Honor, but for the purposes of their damages model, they rely on averages, and the averages come from, you know, in many cases, other sources and things like that. So you would have to then have the data that went into those original average prices, and then you'd have to pull out all the transactions. You're saying that's impossible. Well, they haven't offered a way, and that's their burden. I'll save the remainder. Let's talk about Article 3. I'm standing. Oh, yes, of course. Thank you, Your Honor. This was a violation of blackletter standing rules, and I'll put it very simply. You really only need to know two principles on this. Principle number one, standing is claim by claim. It's not dispensed in gross, as Justice Scalia famously said, and for the court in Lewis v. Casey. You got to look claim by claim. Principle number two, the class action device adds nothing to standing. So you have 13 states here where there's no name plan, and it's a representative action. If there's nobody from those states, they can't represent others. The district court said, well, substantively these claims are similar. We submit that that analysis can't be reconciled with Supreme Court precedent. What percentage of the putative class arguably lacks standing? I don't know percentage. I can tell you it's 13 states, so roughly a number of the states. But like for example, one example is the DI, Virgin Islands, and there's no one, but it's only maybe one claim, right? I don't offhand, Your Honor, I don't recall the exact numbers. I can try to have that. It seems like if we don't know that number, it's a jurisdiction by jurisdiction. It may be you're aware, we're all waiting for the Supreme Court to give us the answer on this Article 3 versus Rule 23 and standing, and one way of looking at it is what percentage of the putative class lacks standing? And if it's like five or six percent or something, then it might be considered de minimis, and it's not so much of a problem. But if it's more than that, you got a problem. I'm aware of those cases, and obviously LabCorp didn't reach the merits on that, but I think of this a little bit differently, Your Honor. Here, we're in indirect land, indirect purchaser land, so we're not under, you know, the Sherman Act. We're under state law, right? So you look at state law to determine where there is a claim, and when there are 13 states where there's no named plaintiff, you know, the case cited by the District Court didn't grapple with any of the principles of standing law that the Supreme Court has emphatically been enforcing for decades on this question, and it just takes those states out of the picture, whatever the numbers. Is some percentage of the claims that you're talking about claims that have no injury at all or that simply have a different kind of injury among the class? Well, of course there's a superiority issue that I won't take time with for purposes of oral argument, where there's just huge variations in the state law, but I think of it very simply as a class action is a representative action. You can only represent what you have, so if you don't have a named plaintiff who made a purchase in state X and therefore is injured under state X laws, they can't represent. But LabCorp was a different question, right? I understood LabCorp to be saying, well, we have some percentage of plaintiffs that arguably suffered no injury, right? Not what we have here, which I thought was we, everyone has allegedly suffered an injury, but they may have suffered different injuries based on the inconsistencies of state law. I think, I'm glad you've clarified your question that way. No, I mean, if you didn't buy and if there's nobody who bought in state X, nobody has an injury in state X. Full stop. There's 13 states where there's no purchaser. Correct. State law defines the injury. So LabCorp is about, you know, the courts of circuits have gone different ways. Sometimes some say de minimis is okay, you know, some take a hard line on Article 3 on that, but that's not quite what you have here. There's just no dispute that there's no named plaintiff from the 13 states, and since state law defines the injury, that's the end of the matter. Well, we've got to decide whether it's a standing issue or it's a Rule 23 issue. Do we not? I mean, what the district court said is that because the laws are materially the same, success on one more or less dictates to others. It wasn't a LabCorp issue as I see it, Your Honor. I see it as, and I mean, that's relevant. I know the court didn't dig that case and didn't reach it, but I think the fact that it's not a LabCorp issue. As to us attainability, the problems Mr. Johnson identified are the same for Clobetasol, but the class is about ten times larger. There's an estimate 200,000 end payers who purchased Clobetasol during the relevant period. So the seven named plaintiffs who produced Clobetasol records here, including the Sargent Benevolent Association, which as you heard has its own issues, there are only three one hundred thousands of one percent of that total. So it's even more of a leap for Ms. Kraft to say that there are these receipts available out there. But we don't need to speculate about whether or not individualized inquiry would be necessary here because of the opt-out litigation we already had in connection with the Sandoz settlement. And we've given the court that record which shows that many insurers came into court and said we can't tell without extensive unprecedented review where we are acting as an end payer and where we are acting as an ASO. And I'll just refer you to the record of the submissions by the Blue Cross Blue Shield entities at 966 and 976 and what Cigna told the court in 988 and 989. And let me quote from what Cigna told the court at the final approval hearing. It said the process for gathering those contacts is very manual and burdensome and unfortunately comes down to analyzing the claims data, figuring out the client name that has a claim within this class, going to one of several different systems to see where that client's information is stored, pulling down a PDF of the agreement and then reviewing it. Cigna called it an unprecedented effort and that's the kind of inquiry we're going to have here. On predominance it's the same model. The fact that it shows this masking, this injury for CVS where there could be no injury for CVS on myelin also means that the model cannot be relied upon to show injury for clobetisol because it's exactly the same model. On Comcast we don't have the same issue as Clomipramine but we do have the same Comcast issue as Yon asked about in connection with the DPPs and it's very important here for activists because the claim against activists is different. Activists joined the alleged the market for clobetisol nine months after everybody else and the real claim against activists is that after we joined it engaged in one call concerning one customer with one competitor and it's really a market allocation claim and it has different effects than the effects alleged for everybody who had been in the market throughout the class period. But the model does not segregate between the damages suffered as a result of the claim against activists. We're here for a reason. We're here as the last party standing for a reason because our case is different. Our summary judge's motion is still pending. On the motion to dismiss the court said that the case against activists is a close call but the model is not going to be able to deal with it if we're ultimately successful. Thank you. Thank you. May it please the court. Matthew Duncan for the NPAIR plaintiffs, Appalese. I want to be as helpful to the court as possible so I'm going to address in turn the issues the court has asked about. Article 3, CVS and the Comcast issue, averaging and and ascertainability. I'll take those in turn very briefly just to start your honors. This case at bottom is about the standard of review. This litigation has been going on for 10 years based on a massive record. The district court made factual findings on virtually every argument, every factual assertion you've heard from the other side. The process here could not have been more rigorous and the factual findings resolve issue after issue after issue. Now, let's start with Article 3. Since that's a legal question the court has to resolve. There is no Article 3 issue in this case and I would direct your honors to Judge Bibas's decision in the Twardzik case cited in our brief. That's the matter in which Judge Bibas sat by designation in the District of Delaware. Analysis there is clean, straightforward and gets this issue exactly correct. So, in the class action context, the Article 3 inquiry looks solely at whether the named plaintiffs have standing for their own individual claims. That's what this court held in Neal, reaffirmed in Miello, reaffirmed yet again recently in Drummond, among other cases. It's settled circuit law and fully consistent with all Supreme Court Article 3 authority. Now, second, to the extent that absent class members have their own factually similar claims that under different state laws, that does not implicate Article 3 at all. That's a Rule 23 matter, as Judge Bibas explained, as the other courts of appeals unanimously hold, as all the treatises explain. Second Circuit also? Second Circuit? Second Circuit, yes, your honor. All of the circuits unanimously reached this conclusion that this is a Rule 23 issue in this context. What's more, I would say this, and your honor, you asked about the LabCorp pending issue. To the extent you want to sort of ignore Neal and the line of circuit law that says you just look at the named plaintiffs and evaluate whether absent class members have an injury in fact here, that standard is easily met. Every single class member, named plaintiff or absent class member, alleges precisely the same injury, economic injury from price fixing. So, no matter how you look at this, we think there's no Article 3 issue here. That brings me to Comcast and CVS. So, why isn't, why isn't the way you just phrased it stating it at too high a level of generality? They all have the same interest, higher prices. Well, I think your honor, because the Article 3 inquiry does, and the Supreme Court has been very clear about this, does not parse causes of action. But Comcast does. It's about injury. Okay, sure, and I'm happy to talk about Comcast. I was transitioning to Comcast. Absolutely. So, let me start with this on Comcast. Our theory of liability in this case, and your honors alluded to this earlier in the argument, has been precisely the same from one day, from day one. This is a price-fixing conspiracy, a cartel case that caused class-wide injury. Now, of course, as in any cartel case, there's all manner of conduct that the price fixers engage in, and we have evidence of this. I mean, yes, they were on the phone to fix list prices, fix contract prices, swap customers around. They did all of this, and we put forward the textbook multiple regression damages methodology to measure the overcharges caused by that type of single cartel scheme. And so, from day one, our liability theory has aligned squarely with our damages model. Has your model separated out the effects of the different kinds of illegal behavior? No, your honor. The price-fixing, the bid rigging, the allocation. No, your honor. We have never done that because that is not how these cartel damage models work. They measure overcharges caused by the conspiracy as a whole, and so there's no disconnect here whatsoever. And this brings me, though, your honor, to the dispute about the CVS issue, right? And so, the premise of their Comcast argument is that those CVS transactions are out of the case. The premise is wrong. It's wrong as a matter of law. It's wrong as a matter of interpreting the district court's summary judgment. You're saying, wait a minute, you got partial summary judgment five months after the class certification, and it was in connection with his sales to CVS. Yes. How does that, how does that not affect this case? Oh, let me walk through it, your honor, and there's a couple points to unpack here. First of all, just to contextualize, this has no bearing on the Klobetasol case at all. This is a clomipramine case only issue. I understand that. Okay, so that's number one. Number two, let's, and just let me just get this out of the way, because this is really important procedurally. Even assuming, for the sake of argument, that Milan is correct, that we can't recover for these transactions on the merits. Assume that's correct. We think that is dead, dead wrong for reasons I'll get into. None of that casts any doubt on the class certification order, and here's why. Because the record is very clear that if necessary, at a later merit stage of the case, we can remove these transactions. And so when Milan says in the reply brief, this is at page 14, that we failed to propose a method to remove these transactions, that is flatly contradicted by the record, your honor. And let me direct the court to this. Klobetasol, appendix 71, that's note 53 of the district court's Daubert opinion, addressing exactly this point. Also, Klobetasol, supplemental appendix 36, that's Dr. McClave testifying on this very issue at the Daubert hearing, explaining that if it becomes necessary later in the case to remove these contested transactions, that can be done quote easily. So the record is clear on this, and Judge Roof indeed anticipated merits litigation on exactly this point. And so in all events, this court should allow the district court to resolve a merits issue in the post-merits stage of the case. I'm sorry, the post-certification stage of the case. Obviously, there's nothing unusual about a district court doing that type of thing. Let me back up. What did the district court hold in granting Milan partial summary judgment? What was the holding? Your honor, obviously the parties have a serious dispute about the interpretation of that summary judgment. What did the court hold? Well, the court held that as to our conspiracy case, so let me break it down this way. They filed two standalone motions for summary judgment. One on conspiracy issues, one on injury and causation issues. The parties briefed this causation CVS dispute exhaustively in the context of the class-wide injury and causation motion. The district court denied that motion flat-out. That's the portion of the summary judgment decision that we've cited in our briefs. Now, Milan has pulled language from the court's resolution of a threat of the conspiracy case, and even though we had briefed these causation issues at length, factually and legally, that portion of the summary judgment decision doesn't mention any of our proof of injury on these transactions, doesn't mention any of the black-letter Supreme Court law on the material causation standard, and so we think it's just an implausible reading of the summary judgment decision that they ruled against us in the way that Milan says the court did. In all events, I read what the court says. Although a reasonable jury could determine that overcharges to EPPs and payers flowed from CVS's acquisitions of clomipropene from manufacturers other than Milan, no reasonable jury could hold Milan liable for overcharges when it did not in fact raise prices for clomipropene to CVS Pharmacy. Yes. That's, that's, so it granted Milan's partial summary judgment motion as to the sales to CVS Pharmacy and denied it as to the other entities. Your Honor, we think that's at most loose language in resolving the conspiracy issue. So then, how does, and I, the way I understand it, it basically excludes 373 members of the putative class. If they are correct on the merits, yes. And so that means that those people were not injured, or those members were not injured, is that correct? According to Milan, yes, if those transactions are out of the case, and we would simply remove them. Isn't that a problem if the class then continues to include those uninjured members? Well, if those, if the court post-certification, if this court were to affirm certification, here's the suggestion I have procedurally on this. Affirm certification because all of the class certification record supports that. These are merits issues. We'll go back to the district court, we'll ask the district court to have the first opportunity to clarify what we view as a highly ambiguous, and if they are correct, dead wrong, summary judgment order on the facts and the law of this issue. And in that case, if Judge Roof says, nope, Milan is correct, these transactions are out of the case, we will take them out of the case and those class members won't be part of the case. So is that the reason you didn't move to modify the class definition to exclude the 373 members? That's absolutely right because we are very certain. You want another bite at the apple? That's absolutely right, Your Honor. And I'm happy if the court is interested to walk through at a high level our argument on why we, as a matter of black-letter causation law, the factual record in this case are correct on the CVS issue. Again, that's a merits dispute. It's been fully briefed in the district court at the summary judgment stage below. We are very, very certain that we are correct on this issue. And I would point, Your Honor, if I just may, one thing on this. Look at the briefs in this case on this causation dispute. We have cited Supreme Court Third Circuit black-letter case law on causation standards. The other side is hanging on the thinnest of threads. They ignore all of that causation law and they've cited an NPO in a non-price-fixing case, pulled one sentence out of it. That case didn't even apply the rule that they say this court should embrace on proximate causation. Then they cite some district court opinions that if you read them carefully support us more than them on causation. And in the end, material cause is the standard. It's a fundamentally fact-bound standard that sends these types of case of disputes causation issues to the jury. And we have overwhelming factual proof that this conspiracy in fact caused injury to end payers on these CVS transactions. So for a whole host of reasons, we think we are right on the merits of this issue. But in all events, the district court should have the first opportunity to clarify its order. If it continues to adhere to the previous decision, you're going to have to revise your damages model, will you not? We will simply remove those transactions and again, as I say, the record is clear that that can easily be done. We'll simply take those transactions out of the model. Therefore, at all stages of this case, our damages case will align with our liability case. No Comcast issue. I want to go back to standing for a second. Do you agree that there are these 13 states where there was no purchaser? Yeah, we do not have a name. Our named plaintiff for one of the cases, our named plaintiffs have not paid for transactions and I believe that's the correct number of states. If there's, so even if we decide at this posture that it's a Rule 23 issue rather than an Article 3 issue, I mean at some point Article 3 is gonna, there has to be standing at some point. They can't get a judgment if there's no. I mean this is the LabCorp issue. At what stage of the case? And do you have a mechanism to winnow them out? Well, no, your honor. This is critical and I tried to make this point and I probably didn't do it very well earlier. Those absent class members, whether or not we have a class representative with Trent who made purchases in those states, those absent class members have their own injury in fact. They have Article 3 standing. They can participate in a claims process in this case and recover from a judgment. There is no Article 3 problem with that. If that makes sense. What's their Article 3 injury? Excuse me? What is their Article 3 injury since? Oh, they overpaid for the price fix products. Their injury in fact in this case is exactly the same as every other class members. My time is very short, your honors. I want to be responsive. There were averaging arguments raised. I'm happy to answer any questions on that. There are ascertainability issues raised. Look, are factual showing on ascertainability here is perhaps the largest ever in the history of the federal courts. We have come forward and all of the district courts findings rest on enormous amounts of information. They say we rely on a couple of class representative receipts. That's not true. We have all of the insurance industry data. These are the largest end payers in the country. They came forward with their own receipts for these transactions. We have expert evidence that was vetted exhaustively under Daubert. The district courts factual findings on all of these disputes rest on that evidence and more. All of these things were fully and fairly vetted at the district level. Did the district court address your friend's suggestion that the so-called receipts don't actually have helpful information? That's just not true. The argument was raised. Why did the district court address it? Well, I mean, because this is a sort of a here's what the district court said is that it found that these records exist and they identify the end payers and that end payers can come forward with their records at the appropriate time. And so the particular receipts that our class representatives put forward, they show the transactions they paid for, the amount, the pharmacy, all the detail. Their own expert acknowledged that those are the claims that the class representatives paid for. And so this is a good point to step back and remember the bigger picture here on ascertainabilities, your honor, on ascertainability. I mean, this is utterly standard class action claims administration. The Byrd line of cases, I think Judge Smith's Byrd opinion is incredibly important in not extending Marcus and Carrera in profoundly disruptive ways into the heartland cases for rule 23 certification. I mean, Judge Smith goes out of his way to explain that an utterly standard claims administration process involves class members coming forward with their own proof of class membership, often attested by an affidavit. As Judge Smith explained, that is... Do we have affidavits here or promised affidavits? No, well, your honor, that's that's another thing that's contradicted by the record. I mean, our claims administration expert in this case, at the very up front in his declaration, explained precisely the information that would be included in any affidavits used to validate these claims. It's simple. You say, these are my transactions. I'm covered by the class definition. I paid for these records, right? And so my time is up, your honors. Any other, any further questions? Otherwise, I'll sit down. Can we just briefly discuss the variations in state law and the consumer protection claims? I'm wondering where the district, where would you point to the district court having fully and meaningfully considered the elements of the seven state laws that are at issue? Fair enough, your honor. That's that's one of the more concise portions of the district court opinion. I think that's a fair question. What I would direct your honor to is the exhaustive briefing on this and our trial plan itself. And your honor, I would also say the care Judge Roof took with respect to the unjust enrichment claims highlights the care she took in addressing manageability of these types of claims. In any event, on the substance of the question, your honor, we explained the elements of the consumer protection claims at great length in our trial plan. The substance of our summaries was not contested. We have a proposed verdict form that answers all of those questions. The district court said, I credit the plaintiff's showing on this. This case is manageable. The common issues do in fact predominate, which they do. And so I take the thrust of the court's question that that's a more concise portion of the district court's analysis. It just leads to an overall lack of inference and context that we're being asked to read into this rather important ruling on this question and some other ones. And I appreciate your argument in response, but doesn't that all sort of suggest that we're lacking clarity here to know how this is going to move forward? I don't think that's necessarily correct, your honor. I think the substance is what matters here. I mean, there's no dispute and it's it's obvious that all of the consumer protection claims turn on the same core issues and proof. And moreover, your honor, I think this is really important. Our verdict form and our trial plan expressly account for any additional elements that any of the state laws required. Our verdict form is very manageable. It's concise. All of these things fall well within the trial court's discretion on what are fundamentally case manageability issues. And so I take the court's point, but I think the substance of this issue, we are absolutely correct. Okay, thank you. Thank you. Thank you, your honor. I just like to make four quick points starting with article three. Let's say it's not a lab corp issue, but I would direct the court to worth versus Selden. It says that the name plaintiffs must show that they personally have been injured. Not that injury has been suffered by other unidentified class members. Transunion federal courts lack the power to order relief to any uninjured plaintiff class action or not. This is standing law. 101 Neil repeats these principles. The Second Circuit decision they point to does not grapple with any of the Supreme Court authorities. I would point the court also to Judge Salas's opinion in Snody, which is excellent. It deals with all of this. Second, on the Comcast issue, if this is a textbook damages model, I would hate to see one that's not. It's, there are 24% of the transactions in this case are gone. And their damages model claims a hundred percent. Your friend says, fine, we'll just pull them out if we have to. And so first of all, it's important to focus on the difference between uninjured purchasers and transactions that are injured. You may have an end purchaser who has an injury, but then there's all these transactions where they weren't injured. So for purposes of ascertainability, you're asking how do we know if somebody's in or out of the class, for example, and of course there's a Article 3 aspect to that too. But predominance also focuses on the transactions problem. 24% of the transactions are out and, you know, they dispute the reading of the district court's opinion. What about the argument that that's just a merits liability question? In other words, Tarrow and Sandoz overcharged CVS. They've settled. Mylan did not, according to the court. And I guess the other side's going to try to revisit that. Why isn't that a liability question as opposed to a predominance question with respect to class certification? Because both Comcast and Lamikdahl say you have to resolve these sorts of issues of class certification. You have to match theory of injury with liability. Correct. And so for purposes of damage, you have to have a damage model that matches your theories. And you have to do it now. You can't wait to have to do it now. Exactly. So I would just, the last thing I would say on this Comcast thing is that, you know, Judge Ambrose, you focused on the portion of the opinion that talked about the 6% from Tarrow and Sandoz. For present purposes, we're not disputing that 6%. But, you know, they are now advancing new theories that were forfeited below, rejected below, are out of the case. And the most important thing is they lack any record support and they're not tied to their damages model. So they know they've got a problem with the summary judgment decision. So they say, well, we've got an umbrella theory, we've got an allocation theory. Evidence isn't there, but more importantly, the damages model doesn't match that either. So that's Comcast. Then on this question of predominance, I just want to stress... This is not talking about the case 2020. It's talking about case 2022, correct? Only? I have to remind myself of the numbers, Your Honor. I think the end pair cases are 2020 and 2022, but this is only the one. You've got the partial summary judgment only in the second one. So, and I think Mr. Korpis, you know, addressed some of the differences, but you've got a fundamental defect in the methodology that cuts across the cases. I think that's the important point for present purposes. And again, it's not just an issue of uninjured purchasers. It's an issue of transactions where there's no injury. The last thing I'd like to touch on what he said on ascertainability about affidavits and claims forms and verdict forms, he didn't deny that there's no actual affidavits. They remain purely hypothetical. And this court has said in cases like Carrera, you have to be able to see the model in action. It can't just be a, we'll do this later and we promise you we will. As to the claims administration point, I would point the court to our briefs on this issue. Their expert Miller refused to say the class was ascertainable. He refused to put forward a model. So there really isn't anything there either. And they also don't have a verdict form. He referred to a verdict form. We've yet to see it. This remains a situation where the plaintiffs are saying, rely on our assurances. We'll get to these issues eventually. The reason they're doing that is because if they actually put forward the data, it would be transparent that it cannot satisfy this court's decisions in Lamictal and Comcast and NISBET. Can you give us a couple paragraphs on Judge Mady's claim about variations in state law? Your question, I'm sorry. The district court meaningfully addressed the variations in state law in the consumer class. So this is an issue for both superiority and article three. They really haven't grouped things together the way they're required to do under Grandolski. That's the superior superiority piece. And that's, he did some grouping, right? Yeah, there's three consumer protection groups. I mean, what would you have done? The grouping really didn't grapple with the differences in individual state laws. There are differences in defenses and so forth. And this creates a major practical problem. What grouping would you have suggested? Well, I think, I guess there's, in that grouping, how many, how many are involved in that, by the way? How many claims? States? Yeah. 35. I think that's true in both cases. Well, 35 are antitrust, right? 28 are antitrust. Your Honor, at this moment, I don't have the answer to that question, but I thought it was 35 in both cases. So I thought it was like two, two, three, whatever. You may be right, Your Honor. I apologize. So it's not a big issue, but what grouping of those seven, I think, that were involved, what would you have done? Well, Your Honor, I think you have to just take one example that we discussed in our briefs. It doesn't deal with individualized defenses. What would you have done to make it, what would you have done? Not what, not what the problem is. Like, we've got your briefing on that. It's a simple question of treating like cases alike. And, you know, there's a portion of our brief where we go through the differences in state law and things like defenses and whether a consumer is a consumer in one state versus the other. And so how would you have to deal with those seven cases? I'm sorry, Your Honor? You're writing the opinion. How would you group those seven states? Well, I think you have to have, honestly, I don't think seven groupings does it because of the differences. How would you group it? Well, our basic point, Your Honor, is that there's so many differences that it just creates kind of an insurmountable superiority problem. But at a minimum, it's got to be, you're saying, it's got to be more granular. It's impossible to group them, despite what we've said in Sullivan, GM, Truck, etc., etc. The plaintiffs have pointed only to their trial plan on this. I would say at a minimum, you've got to be twice as granular. I mean, you have, you have to deal with these differences. We stand on our briefs on that point, Your Honor. Okay, thank you. No further questions. We Let's get the transcript from this argument and we'll have the sides split it, split the cost. The second argument, in other words. Yeah, the EPP argument.